IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs July 9, 2002

## TONY S. WALKER v. STATE OF TENNESSEE

**Direct Appeal from the Circuit Court for Gibson County**
**No. 15248     L. T. Lafferty, Judge**

_____

**No. W2001-02921-CCA-R3-PC  - Filed February 28, 2003**

_____

The petitioner appeals the denial of his petition for post-conviction relief from his conviction for first degree felony murder, for which he was sentenced to life imprisonment.  He argues that:  (1) he received ineffective assistance of counsel; and (2) the post-conviction court erred in finding that his statement taken by law enforcement officers did not violate his constitutional rights.  Following our review, we affirm the post-conviction court's denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and NORMA MCGEE OGLE, JJ., joined.

J. Mark Johnson, Trenton, Tennessee, for the appellant, Tony S. Walker.

Paul G. Summers, Attorney General and Reporter; Thomas E. Williams, III, Assistant Attorney General; Garry G. Brown, District Attorney General; and Ted Neumann, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

### FACTS

The facts upon which the petitioner's conviction is based were set out in the opinion of this court in the direct appeal of this matter:

> The victim in this case, Charlie Jones, was the owner of a neighborhood grocery store located in Milan.  At the time of his death, Mr. Jones was seventy-seven years of age.  On December 8, 1995, a customer entered Mr. Jones' store and found him lying on the floor bleeding from the head.  Law enforcement officials were immediately notified.  The Milan Police Department's records

indicate that the call was received at 1:27 p.m. At approximately 3:15 p.m. that afternoon, the Jackson Police Department was notified that a gunshot victim had been admitted to the trauma unit of the Columbia Regional Hospital in Jackson. The patient's injuries were caused by multiple gunshot wounds. The gunshot victim was identified as the appellant. After being approached by the uniformed officer, the appellant immediately stated "How is Mr. Charlie?" The appellant then proceeded to inform the officer that he had walked in on an apparent robbery of Jones' grocery by two assailants and became involved in a scuffle. The appellant explained that he did not realize that he was shot until he returned home. Subsequently, the appellant, after being transferred to Jackson Madison County General Hospital, changed his story, admitting that he and Jones had gotten into a confrontation over money and that he shot Jones after obtaining control over the weapon. Specifically, the appellant stated that he went to Charlie Jones' store, approximately one-half block from his residence, to purchase something to eat before reporting to work later that afternoon. At the store, the appellant purchased a Faygo pop, matches, and a bag of Doritos, totaling ninety cents. The appellant tendered a twenty dollar bill for payment, but Jones allegedly only gave him nine dollars and ten cents in return. An argument ensued concerning this discrepancy. The appellant stated that Jones' told him to "get [his] black ass out of the store." The appellant left the store and went home.

Angry over what had just occurred, the appellant related that he armed himself with a hammer and, determined to get his money, returned to the store. Again, the appellant confronted Mr. Jones. At some point, Mr. Jones retrieved his "Smith & Wesson five shot .38 pistol" and fired two shots at the appellant. The appellant was struck once in the right front thigh and once in the right hip. In retaliation, the appellant threw the hammer at Mr. Jones, striking him on the back of the head. A struggle then ensued over control of the gun. The appellant gained possession and fired one fatal shot to the back of Mr. Jones' head. The appellant picked up a wallet laying on the floor and left the store.

Officers discovered cash in the amount of two hundred and one dollars in the pocket of the appellant's sweat pants. Initially, the appellant stated that he had just cashed his paycheck, however, he later admitted that the funds belonged to Charlie Jones. Police officers located the victim's wallet and the gun in a ditch behind the appellant's house. Hidden under a flap inside the wallet was three

> hundred and thirty dollars in "old" or "antique" money. However, officers were unable to locate the matches that the appellant alleged he had purchased from Jones', nor were they able to find a twenty dollar bill inside Jones' cash register.

State v. Tony Scott Walker, No. 02C01-9704-CC-00147, 1997 WL 746433, at **1-2 (Tenn. Crim. App. Dec. 3, 1997) (footnotes omitted), perm. to appeal denied (Tenn. Sept. 21, 1998).

As a preliminary matter, we note that the State argues on appeal that, according to Tennessee Code Annotated section 40-30-216 and Tennessee Rule of Appellate Procedure 4(a), the post-conviction court lacked jurisdiction to hear this matter. We will review this claim.

According to the record, the post-conviction court granted the State's motion to dismiss the original petition for post-conviction relief on November 30, 1999. The petitioner filed a timely *pro se* notice of appeal on December 10, 1999. Six days later, his court-appointed attorney filed a Motion to Set Aside Dismissal of Petition for Post-Conviction Relief, asserting that counsel had not received notice of the State's motion to dismiss or the court's order granting that motion. That dismissal appears to have been set aside, although there is no order in the record doing so. The petitioner's counsel filed an Amended Petition for Post-Conviction Relief on March 17, 2000, and was allowed to withdraw from the case on March 27, 2000. The petitioner was appointed new counsel, and the court allowed new counsel to file a second amendment to the petition, which was done on July 28, 2000. On January 10, 2001, this court dismissed the petitioner's *pro se* notice of appeal of his original petition, with leave to file a proper notice of appeal at the conclusion of all post-conviction proceedings, our order stating the record was "clear that the notice of appeal in this mater was inadvertently filed prematurely on December 10, 1999."

The post-conviction court then conducted a hearing on the petition for post-conviction relief, as twice amended. Although the State did not argue that the post-conviction court was without authority to hear the petition, it has done so on appeal. However, we conclude that the State waived this argument by participating in the post-conviction hearing, reserving for appeal the claim that the court was without authority to proceed with the hearing.

## ANALYSIS

### I. Ineffective Assistance of Counsel

The petitioner's first claim, that trial counsel was ineffective, includes a number of arguments: (A) the petitioner was not "asked if he wanted a mental evaluation"; (B) trial counsel did not present at trial any of the witnesses on a list provided him by the petitioner; and (C) trial counsel neither sought to introduce photographs of the two gunshot wounds inflicted upon the petitioner during his "confrontation" with the victim nor asked the petitioner to display his healed wounds to the jury.

A post-conviction petitioner bears the burden of proving his allegations by clear and convincing evidence. See Tenn. Code Ann. § 40-30-210(f). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the court are conclusive on appeal unless the evidence preponderates against them. See Tidwell v. State, 922 S.W.2d 497, 500 (Tenn. 1996). Where appellate review involves purely factual issues, the appellate court should not reweigh or reevaluate the evidence. See Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997). However, review of a trial court's application of the law to the facts of the case is *de novo*, with no presumption of correctness. See Ruff v. State, 978 S.W.2d 95, 96 (Tenn. 1998). The issues of deficient performance of counsel and possible prejudice to the defense are mixed questions of law and fact and, thus, subject to *de novo* review by the appellate court. See State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999).

The petition for post-conviction relief in this matter is governed by the Post-Conviction Act of 1995, which provides that the petitioner has the burden of proving his allegations by clear and convincing evidence. Tenn. Code Ann. § 40-30-210(f) (1997). The standard of review which we apply to this matter is set out in Fields v. State, 40 S.W.3d 450, 456 (Tenn. 2001):

> The standard of appellate review applied to ineffective assistance claims has always been that a trial court's findings of fact are entitled to substantial deference on appeal unless the evidence preponderates against those findings. See Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997); Tidwell v. State, 922 S.W.2d 497, 500 (Tenn. 1996). Under this standard, appellate courts do not reweigh or reevaluate the evidence or substitute their own inferences for those drawn by the trial court. Henley, 960 S.W.2d at 579. Furthermore, questions concerning the credibility of the witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the trial judge. Id.

In order to determine the competence of counsel, Tennessee courts have applied standards developed in federal case law. See State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that the same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee). The United States Supreme Court articulated the standard in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), which is widely accepted as the appropriate standard for all claims of a convicted petitioner that counsel's assistance was defective. The standard is firmly grounded in the belief that counsel plays a role that is "critical to the ability of the adversarial system to produce just results." Id. at 685, 104 S. Ct. at 2063. The Strickland standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must

show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

Id. at 687, 104 S. Ct. at 2064. The Strickland Court further explained the meaning of "deficient performance" in the first prong of the test in the following way:

In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances. . . . No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant.

Id. at 688-89, 104 S. Ct. at 2065. The petitioner must establish "that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms." House v. State, 44 S.W.3d 508, 515 (Tenn. 2001) (citing Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996)).

As for the prejudice prong of the test, the Strickland Court stated: "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." 466 U.S. at 694, 104 S. Ct. at 2068; see also Overton v. State, 874 S.W.2d 6, 11 (Tenn. 1994) (concluding that petitioner failed to establish that "there is a reasonable probability that, but for counsel's errors, the outcome of the proceedings would have been different").

Courts need not approach the Strickland test in a specific order or even "address both components of the inquiry if the defendant makes an insufficient showing on one." 466 U.S. at 697, 104 S. Ct. at 2069; see also Goad, 938 S.W.2d at 370 (stating that "failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

By statute in Tennessee, the petitioner at a post-conviction relief hearing has the burden of proving the allegations of fact by clear and convincing evidence. See Tenn. Code Ann. § 40-30-210(f) (1997). A petition based on ineffective assistance of counsel is a single ground for relief, therefore all factual allegations must be presented in one claim. See Tenn. Code Ann. § 40-30-206(d) (1997).

We note that when post-conviction proceedings have included a full evidentiary hearing, as was true in this case, the trial judge's findings of fact and conclusions of law are given the effect and weight of a jury verdict, and this court is "bound by the trial judge's findings of fact unless we conclude that the evidence contained in the record preponderates against the judgment entered in the cause." Black v. State, 794 S.W.2d 752, 755 (Tenn. Crim. App. 1990). The reviewing court must

indulge a strong presumption that the conduct of counsel falls within the range of reasonable professional assistance, see Strickland, 466 U.S. at 690, 104 S. Ct. at 2066, and may not second-guess the tactical and strategic choices made by trial counsel unless those choices were uninformed because of inadequate preparation. See Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). The fact that a strategy or tactic failed or hurt the defense does not alone support the claim of ineffective assistance of counsel. See Thompson v. State, 958 S.W.2d 156, 165 (Tenn. Crim. App. 1997). Finally, a person charged with a criminal offense is not entitled to perfect representation. See Denton v. State, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). As explained in Burns, 6 S.W.3d at 462, "[c]onduct that is unreasonable under the facts of one case may be perfectly reasonable under the facts of another."

Trial counsel testified at the post-conviction hearing that he had been licensed to practice law in Tennessee since 1975, had participated previously in approximately six to ten first degree murder cases, and was death penalty certified. He testified that the petitioner maintained "steadfastly [and] resolutely certainly from the time we got into the case" that he killed the victim in self-defense. Counsel believed that this was a viable theory to put in front of the jury, that the petitioner had been shot first and was simply defending himself.

We now will review the petitioner's claims as to ineffective assistance of counsel.

### A. Failure to Request a Mental Evaluation

At the post-conviction hearing, the petitioner testified that neither trial counsel nor his investigator "asked [the petitioner] if [he] needed a mental evaluation, not at any time since [he] was down there." As to this issue, trial counsel testified that he "may" have discussed, with the petitioner or the investigator, obtaining a mental evaluation of the petitioner. Consequently, we are left with the claim that trial counsel was ineffective because he did not obtain a mental evaluation of the petitioner or, at least, discuss with him whether he needed one.

As to this claim, the post-conviction court noted in its written findings of fact and conclusions of law that the petitioner had not alleged "that he suffered from some form of mental illness or what he hoped to accomplish with [a mental] evaluation." Further, the court noted that the petitioner had no apparent history of mental illness and the petitioner's conduct at the time of trial had not caused counsel to believe that a mental evaluation was needed. Accordingly, the post-conviction court concluded, as to this issue, that the petitioner had failed to establish that trial counsel was deficient or that he was prejudiced by the that fact he did not receive a mental evaluation prior to the trial.

We agree that the record contains no proof as to any mental problems the petitioner had ever had or a hint of what the results of a mental evaluation might have been. We note that the petitioner did not testify that he had received any sort of mental treatment or medication while incarcerated. Based upon all of this, we conclude that the record supports the conclusion of the post-conviction

court that the petitioner failed to carry his burden of showing that trial counsel was ineffective in not obtaining a mental evaluation or that he was prejudiced thereby.

## B. Failure to Present Defense Witnesses

The petitioner argues that trial counsel was ineffective because he did not present as trial witnesses several persons named on a list given by the petitioner to counsel. At the post-conviction hearing, the petitioner testified that he had given counsel the names of Sharon Newbill, Diane Sturdivant, and Martha Edward as relevant witnesses, but none were called to testify at the trial. Subsequently, Sharon Newbill testified at the post-conviction hearing, saying that she knew the petitioner through his stepmother. She said that the victim was "a very mean man," with a "[v]ery harsh" temper. Asked if he was aggressive, she replied, "Very, very much so." On cross-examination, she said that the victim never treated her badly, but she had seen him do so to others. Also, she said that she had not talked with the petitioner about her opinion of the victim.

Diane Sturdivant testified as to the victim's temperament:

> Well, I had known [the victim] since I was 10 years old and he was the type of person – he was very arrogant. He wasn't a nice person 'cause I know on occasion when I went in the store a lot of time I could smell liquor on his breath and he was always hollering at his customers and he never would hand you your change. He would always throw it at you and he would ask you, "If you're not buying anything get out of my store. I don't want you here," and I seen occasion where he had just talked very ugly to little kids. So, he was just – he wasn't a nice person.

During Sturdivant's cross-examination, the post-conviction court terminated her being questioned, saying that her testimony would not have been admissible at trial and that the court had "serious reservations [about] this type of testimony – well, I know they wouldn't have even allowed it."

Martha Edward, the third witness supposedly on the petitioner's list to counsel, was not called to testify at the post-conviction hearing.

At the post-conviction hearing, trial counsel testified that he had no memory of the petitioner's supplying the names of these witnesses. Counsel's investigator said that they had interviewed all known witnesses. As to this issue, the post-conviction court found that trial counsel "or his investigator contacted all the witnesses furnished to them by Petitioner."

On appeal, the petitioner argues that these witnesses "would have testified as to the victim's aggressiveness according to the [petitioner]." However, testimony of a general nature that a victim was an unpleasant, aggressive person is irrelevant. As explained in Neil P. Cohen et al., Tennessee Law of Evidence, § 404[5][d] (4th ed. 2000), "in a criminal case where there is some evidence

suggesting that the victim was the first aggressor, the defendant may offer proof of the victim's prior violent acts with third persons." Here, the evidence offered at the post-conviction hearing was only that the victim was mean, aggressive, and rude, which the post-conviction court determined would not have been admissible at the trial. Trial counsel cannot be ineffective for failing to present witnesses whose testimony would have been inadmissible. Additionally, as to this issue, the post-conviction court resolved the conflicting testimony of the petitioner versus trial counsel and his investigator by finding that the petitioner did not supply the names of these witnesses as he had testified at the hearing. The record fully supports these findings.

### C. Failure to Display Petitioner's Wounds to the Jury

The petitioner argues that trial counsel was ineffective in failing to show the jury photographs of his wounds or the healed wounds themselves. At the hearing, the petitioner explained this claim by saying that showing the wounds would have "served some benefits" and would have been appropriate, since photographs were shown of the victim's wounds. During cross-examination, the petitioner said that he had testified at the trial that, during the incident, he had been shot three times in the back.

In contrast to the petitioner's testimony, trial counsel said at the hearing, as did his investigator, that, at the trial, he had the petitioner show to the jury the scars resulting from the wounds. The petitioner did not recall that this had occurred.

As for this claim, even if we accepted as true the petitioner's belief that he did not show to the jury his healed wounds, we would be engaging in rank speculation were we to conclude that the outcome of the trial would have been different had the jury, in addition to hearing the petitioner's testimony of his being shot, also seen photographs of the wounds, or the healed wounds themselves. There was no issue as to whether the petitioner had been shot. Accordingly, we conclude, as did the post-conviction court, that the petitioner failed to establish that counsel was ineffective or that he was prejudiced thereby.

The record fully supports the findings of the post-conviction court that the petitioner failed to establish either that trial counsel was ineffective or that he was prejudiced by the actions of counsel of which he complained.

### II. Voluntariness of Statement

The petitioner argues on appeal that the post-conviction court erred in concluding that his statement to law enforcement officers was voluntary. Prior to the trial, this statement had been the subject of an unsuccessful motion to suppress. A copy of this two-page, handwritten statement is included in the record on appeal:

Q. Did you go to Charlie Jones Grocery on 12/08/95[?]

A. Yes[.]

Q. What time did you go to the store (Charlie Jones)[?]

A. About 1:00 pm, I think[.]

Q. Did anything unusual take place at Charlie Jones store on 12/08/95[?]

A. Yes, I went to the store to make a purchase that totaled 88¢ so I told Charlie to give me a book of matches and that made it 90¢. I gave him a $20.00 bill and he only gave me back change for a $10.00 bill which was $9.10 and we argued about the change. And I told him that I gave him the money a $20.00 bill but he told me to get my Black ass out of the store and I left and went home[.] [T]hen about 10 minutes later, I went back with a hammer and I went in to the store and was standing by the Fago [sic] pops near his desk[.] [A]nd I raised the hammer and told Charlie I'm going to get my money[.] Charlie was at the back of the store and he walked toward me and said you heard what I told you and he walked behind the counter and he shot at me. And I think after the second shot I threw the hammer at Charlie and I think he shot again. [A]nd I fell to the floor and I had a warm feeling in my leg. [A]nd I knew that I had been shot and I got up and took the gun away from Charlie and shot it toward him but I did not try to hit him just shot[.] [T]hen I left the store and went home across the street. I went to the bathroom to take a bath and when I pulled my pants off I realized that I was bleeding badly. I got dressed and my ride showed up[.] [A]nd he took me to IGA where my aunt works and told her that I needed to go to the Hospital that I had been shot[.] [A]nd then my aunt brought me to the Jackson Hospital.

The post-conviction court, comparing the allegedly illegally obtained statement with the petitioner's testimony at trial, found that "there is little difference as to content or context." After reviewing this statement, we reach the same conclusion. We do not understand why the petitioner complains about its admission, for it appears to be entirely consistent with his version of the facts at the post-conviction hearing. In both the statement and at the hearing, he said that the victim shortchanged him, that he retrieved a hammer and returned to the store, the victim shot him twice, they struggled over the pistol, and the victim was shot in the head. Even if this statement were improperly admitted, as the petitioner asserts, he has failed to show that he was prejudiced as a result, his trial testimony echoing the version of the incident detailed in the statement.

The real difficulty in defending this case was not the statement, but the damning facts, that the petitioner initially said that he had walked into the store as the victim was being robbed, but later claimed self-defense; that while the petitioner was shot in the right front thigh and right hip, both wounds at a distance greater than contact but less than twenty-four inches, the victim was shot in the back of the head from a distance greater than contact but less than six inches; that the victim's wallet containing $330 in cash was found in a ditch behind the petitioner's house; and the petitioner had in his pocket at the time of his arrest $201, which was approximately $70 more than the paycheck he had just received. Thus, based upon the undisputed facts of this case, a reasonable jury could have found that the victim fired his pistol as he was thwarting the petitioner's attack with a hammer and that the petitioner obtained the victim's pistol and executed him, then taking the victim's wallet. Thus, we conclude that the petitioner has failed to establish that he was prejudiced by the jury's hearing his statement to law enforcement officers.

Further fatal to this claim is that the petitioner failed to establish that counsel was ineffective in his handling of the petitioner's statement to the police. In fact, trial counsel filed a motion to suppress the statement, which, according to counsel's testimony at the post-conviction hearing, was heard and denied by the trial court. After being asked whether the trial court's ruling as to the motion to suppress harmed the defense, trial counsel explained:

> Well, there's not a clear yes or no answer to that. The ruling of the Court as I recall was that the statement that [the petitioner] had given to [Lieutenant] Hartsfield was admissible. Since that statement was consistent with what [the petitioner] was telling us insofar as it being self-defense, we didn't think that that was such a bad thing, you know. We would be suppressing something that would be beneficial to us, but [the petitioner] had some very strong feelings about wanting us to file motions to suppress. So, we did that.

Thus, with this complaint as to his statement, the petitioner seeks to relitigate an issue which was resolved by the trial court and not raised in the direct appeal. In fact, it requires some imagination as to why trial counsel would have appealed the trial court's voluntariness ruling as to a self-serving statement of his client which was consistent with the client's trial testimony. We conclude that this issue was waived, which occurs when "the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented[.]" Tenn. Code Ann. § 40-30-206(g) (1997); see Workman v. State, 868 S.W.2d 705, 709 (Tenn. Crim. App. 1993).

## CONCLUSION

Based upon the foregoing authorities and reasoning, we affirm the post-conviction court's denial of the petition.

_____

ALAN E. GLENN, JUDGE